UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BRUNEL JORDONNE and KELSON
SAINVILUS,

                              Plaintiffs,

          -against-

OLE BAR & GRILL, INC., ANGELO
BALBO MANAGEMENT, LLC and LA
HACIENDA BAR, INC.,

                              Defendants.
------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

13 Civ. 1573 (VB)(JCM)

To the Honorable Vincent L. Briccetti, United States District Judge:

Plaintiffs Brunel Jordonne and Kelson Sainvilus (collectively "Plaintiffs") seek to recover

damages for injuries they sustained as a result of an assault in the parking lot of defendants Ole

Bar & Grill, Inc. and La Hacienda Bar, Inc. (collectively "Defendants").  Following entry of a

default against the Defendants, the Honorable Vincent L. Briccetti referred this matter to the

undersigned to conduct an inquest on damages. (Docket No. 66).  The undersigned conducted an

inquest hearing on damages on February 25, 2016.  Mr. Jordonne and his brother, Allendy

Jordonne, both testified at the hearing.  Based on the evidence presented at that hearing, as well

as the admissible evidence submitted to the Court in support of Plaintiffs' motion for a default

judgment as to damages, I respectfully recommend entry of a judgment awarding Plaintiff

Jordonne $2,715,000 and Plaintiff Sainvilus $25,000 in compensatory damages.  Additionally, I

respectfully recommend that the Court not award punitive damages because Plaintiffs did not

present sufficient evidence that Defendants' conduct involved malice or reckless disregard of

plaintiffs' rights.

## I. BACKGROUND

### A. Procedural History

Plaintiffs filed their Compliant on March 8, 2013 against the above-named Defendants, as well as against Angelo Balbo Management, the owner and manager of the premises at which the incident occurred.[1] (Docket No. 1).  On August 9, 2013, after Ole Bar & Grill, Inc. and La Hacienda Bar, Inc. failed to appear in this action, the District Court entered a partial default judgment against these defaulting Defendants. (Docket No. 18).  Plaintiffs and defendant Angelo Balbo Management proceeded with discovery.  Following the completion of discovery, on December 3, 2014, Plaintiffs and defendant Angelo Balbo Management reached a settlement agreement, and they signed a partial stipulation and order of dismissal of the claims against defendant Angelo Balbo Management on March 2, 2015. (Docket Nos. 63, 65).  The case was thereafter referred to the undersigned for an inquest on damages as to the defaulting Defendants. (Docket No. 66).  On September 2, 2015, Plaintiffs filed a motion for default judgment as to damages. (Docket No. 68).  Defendants did not submit any opposition to Plaintiffs' motion.  The Court scheduled oral argument on the pending motion for January 14, 2016. (Docket No. 71).  Defendants failed to appear.  Following oral argument, the Court scheduled an inquest hearing on damages for February 4, 2016, which was rescheduled at Plaintiffs' request for February 25, 2016. (Docket No. 72).  Defendants did not appear at the inquest hearing either.

### B. Factual Background

Defendants' default "is deemed to constitute a concession of all well pleaded allegations of liability." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton*

---

[1] Plaintiffs also brought suit against Omari Grandberry, a performer at the event on September 21, 2012, Edgar Rivera, the owner, officer, and/or director of La Hacienda, and Maserati Styles, an event promoter who promoted the event. (Docket No. 1).  Plaintiffs' claims against these three named defendants were voluntarily dismissed without prejudice on June 11, 2013. (Docket No. 11).

*Masonry & Const., LLC*, 779 F.3d 182, 189 (2d Cir. 2015) (citation and quotations marks omitted).  Defendants have proffered no facts on their own behalf.  As such, the following facts are based on the well-pleaded allegations on liability in Plaintiffs' Complaint, the testimony that Plaintiff Jordonne and his brother gave at the inquest hearing on February 25, 2016, the exhibits received at that hearing, and the inquest materials submitted with Plaintiffs' motion for a default judgment as to damages, to the extent that such materials are admissible evidence on which the Court is entitled to rely.

Plaintiff Jordonne was born on October 22, 1990. (Inquest Hr'g Tr.[2] at 6).  Plaintiff Sainvilus was born on February 25, 1989. (Sainvilus Depo.[3] at 5).  Both Plaintiffs attended a concert and talent show on the premises at 829 Broadway in Newburgh, New York, known as "Club Ole," on September 21, 2012. (Compl.[4] at ¶ 14).  Defendant Ole Bar & Grill, Inc. owned and operated the venue at that address, and defendant La Hacienda Bar, Inc. is a corporation with its principal place of business at that address. (Compl. at ¶¶ 5, 8).  Both Defendants promoted and managed the concert and talent show on September 21, 2012. (Compl. at ¶ 11).  Plaintiffs traveled to Club Ole by chauffeured limousine, and were escorted inside the premises through the VIP entrance by individuals wearing black t-shirts emblazoned with the word "SECURITY." (Compl. at ¶¶ 18, 24-25).  These actions assured Plaintiffs that they were attending a concert at a professionally run venue with adequate security. (Compl. at ¶ 26).

Plaintiffs subsequently learned that the venue was allegedly the site of frequent violent and criminal incidents in 2011, of which Defendants were aware, or should have been aware. (Compl. at ¶¶ 71-72).  Additionally, Plaintiffs alleged that in the months preceding the incident

---

[2] Refers to the transcript of the February 25, 2016 inquest hearing.

[3] Refers to the transcript of Plaintiff Sainvilus' deposition testimony taken on June 6, 2014. (Docket No. 73).

[4] Refers to the Complaint filed in this matter on March 8, 2013. (Docket No. 1).

in September 2012, numerous calls were made to the police concerning violence at the venue. (Compl. at ¶ 80).  Some of this alleged criminal activity was chronicled in local news sources. (Compl. at ¶ 82).

At approximately 1:00 a.m., Plaintiffs left the VIP section of the venue and went to a lower level to watch the talent show. (Compl. at ¶ 30).  Shortly after they arrived, two fights broke out at the venue. (Compl. at ¶¶ 31-32).  Security guards began clearing out the lower level, and would not allow Plaintiffs to return to the VIP section. (Compl. at ¶¶ 35, 37).  As a result, Plaintiffs were not able to exit the building through the front entrance, where their limousine was scheduled to retrieve them. (Compl. at ¶ 36).  Instead, security guards forced Plaintiffs to leave through a back door, which opened onto a dark and over-crowded parking area. (Compl. at ¶¶ 41-42).  While in the parking lot, two men approached Plaintiffs and began pushing and punching them for no reason. (Compl. at ¶ 46).  There were no security guards in the area, however, a witness observed security guards blocking off the area, watching the fighting and not attempting to stop it. (Compl. at ¶¶ 49-54).  The Complaint alleged that Plaintiff Sainvilus broke away from his attackers, but when he tried to leave the parking area, the security guards sprayed him with mace or pepper spray, preventing him from leaving the area. (Compl. at ¶ 55).  The security guards allegedly did not attempt to break up the fighting, although a non-party witness testified in his deposition that some individuals struck security guards that were attempting to intervene. (Compl. at ¶ 59; Inquest Decl.[5] Ex. E at 87-88).

The Complaint alleged that the police were called at approximately 3:15 a.m., and that they responded immediately after receiving the call. (Compl. at ¶¶ 60-61).  The officers observed

---

[5] Refers to the declaration filed in support of Plaintiffs' motion for default judgment as to damages on September 3, 2015. (Docket No. 70).

an attacker punch Plaintiff Sainvilus, who was on the ground, before running away. (Compl. at ¶ 64). The officers also observed Plaintiff Jordonne lying motionless on the ground, bleeding from the head. (Compl. at ¶ 63). They further witnessed an attacker kick Plaintiff Jordonne in the head multiple times before running away. (Compl. at ¶ 63).

Plaintiff Jordonne was taken by helicopter to Westchester Medical Center, where he remained unconscious or heavily sedated for a month. (Compl. at ¶ 66; Inquest Hr'g, Ex. 1 at 3). His discharge summary, dated October 22, 2012, reported that he was brought in as a level two trauma following the assault. (Inquest Hr'g, Ex. 1 at 3). The Trauma Service report from the date of Plaintiff Jordonne's admission noted that in the course of the assault, someone had "stomped on [Plaintiff Jordonne's] face." (Inquest Hr'g, Ex. 1 at 23[6]). He was intubated because he was unresponsive, and he was found to have a subarachnoid hemorrhage, an internal parenchymal hemorrhage, a right mandibular fracture, left ethmoid roof fracture, and a midline hard palate fracture. (Inquest Hr'g, Ex. 1 at 3). He was admitted to the Trauma Intensive Care Unit as a result of the severity of his injuries and was sedated. (*Id.*). He did not undergo any surgical interventions on his traumatic brain injury because it was found to be stable. (*Id.*). He had oral and maxillofacial surgery on September 26, 2012 to fix the right mandibular fracture. (Inquest Hr'g, Ex. 1 at 528-29). Arch bars were installed, and Plaintiff Jordonne was to remain in intermaxillary fixation for six weeks, receiving nourishment through a feeding tube. (Inquest Hr'g, Ex. 1 at 529). Upon discharge from the hospital, Plaintiff Jordonne still required "24-hour support." (Inquest Hr'g, Ex. 1 at 3).

---

[6] This medical record, among others in Mr. Jordonne's certified medical records from Westchester Medical Center, refers to Mr. Jordonne as Barry Breslin. (*See, e.g.*, Inquest Hr'g, Ex. 1 at 3). Plaintiffs' counsel submitted a declaration on March 23, 2016, clarifying that these records are nonetheless Mr. Jordonne's records, and that victims of violent crimes are sometimes registered under an assumed name to protect them from further violence. (Docket No. 74).

At the inquest hearing, Plaintiff Jordonne testified that he did not remember anything that happened to him after he went into Club Ole on the date in question. (Inquest Hr'g Tr. at 15). He said that he did not remember being in the hospital, although he had seen pictures of himself in the hospital, and had been told that he had kicked a nurse. (Inquest Hr'g Tr. at 17). The records from Westchester Medical Center also note that Plaintiff Jordonne was severely agitated and kicked medical staff during his hospital stay. (Inquest Hr'g, Ex. 1 at 82). Plaintiff Jordonne testified about his life before the incident. (Inquest Hr'g Tr. at 6-15). He was born in Haiti and immigrated to the United States in 2003 with his mother and brother. (Inquest Hr'g Tr. at 6). He graduated from Asbury Park High School, and worked at various jobs, including at McDonald's, in a parking lot at a beach, and at an agency inspecting needles. (Inquest Hr'g Tr. at 7-13). He moved out of his mother's house after high school and moved in with his girlfriend, with whom he has a three-year-old son, born just one month prior to the incident. (Inquest Hr'g Tr. at 14-15).

As a result of the incident, Plaintiff Jordonne testified that he has been unable to work. He stated that he is forgetful, not remembering where he put simple items like deodorant or money, and that he gets mad easily. (Inquest Hr'g Tr. at 16). He currently lives with his mother, brother, girlfriend, and son, and he testified that the New Jersey Department of Children and Families will not allow him to be alone with his son. (Inquest Hr'g Tr. at 19-20). He said that he often "goes crazy" and "cursing everyone out" and wants "to do something crazy to [himself] . . . to hurt [himself]." (Inquest Hr'g Tr. at 20-21). He testified that following the incident he is able to read only little words, such as those found in his son's books. (Inquest Hr'g Tr. at 24). He said that he has suffered depression following the incident, and that he received Zoloft at one time, although he is no longer taking it. (Inquest Hr'g Tr. at 30). He explained that he gets angry every day, his head hurts, and he is often frustrated. (Inquest Hr'g Tr. at 31). His daily activities

consist of staying home and watching television, sometimes cooking for his son. (Inquest Hr'g Tr. at 29).  He testified to his lack of independence, as his family members must now watch him. (Inquest Hr'g Tr. at 29).

Plaintiff Jordonne testified that he still has metal braces in his jaw as a result of the mandibular (jaw) fracture.  (Inquest Hr'g Tr. at 18).  He said that the metal bothers him, particularly while he is eating. (Inquest Hr'g Tr. at 18).  He experiences mouth pain at least once a day. (Inquest Hr'g Tr. at 27).  Regarding his back, he said that he could stand for ten to fifteen minutes, sit for forty-five minutes, and that his back also bothers him when he lies down. (Inquest Hr'g Tr. at 26).  He testified that he cannot run or walk fast and that he is unable to do pushups. (Inquest Hr'g Tr. at 21).  He described the pain as a seven out of ten. (Inquest Hr' Tr. at 27).  When asked to describe himself before and after the incident, Plaintiff Jordonne stated that before he was a funny and a happy guy who did not get angry. (Inquest Hr'g Tr. at 33).  Now, he describes himself as a loser, stating, "I don't go to work.  I can't do nothing.  I can't give my son nothing. . . . I'm 25 years old, I don't want nobody to take care of me." (Inquest Hr'g Tr. at 33).

Plaintiff Jordonne's brother, Allendy Jordonne, corroborated his testimony. (Inquest Hr'g Tr. at 35-47).  Allendy is two years older than Plaintiff Jordonne, (Inquest Hr'g Tr. at 35), and he testified that prior to the accident, his brother was smarter than him and happy, and now he is not either. (Inquest Hr'g Tr. at 46).  He stated that his brother used to be "a funny kid" who held jobs to help out his mother. (Inquest Hr'g Tr. at 36-38).  Now, Allendy explained, Plaintiff Jordonne gets angry, a symptom he never showed before, and sometimes the family has to call the police in order to calm him down. (Inquest Hr'g Tr. at 45).  He also said that he now has to help his brother more; remind him to shower and bathe. (Inquest Hr'g Tr. at 46).  Allendy said his brother can no longer handle money – he either spends it or loses it. (Inquest Hr'g Tr. at 47).

Regarding Plaintiff Sainvilus's injuries, the Complaint alleged that an ambulance transported him to the hospital for treatment as well. (Compl. at ¶ 67).  Plaintiff Sainvilus testified at his deposition that he remained in the hospital for a few hours before being released. (Sainvilus Depo. at 110).  He stated that he suffered a contusion and a concussion and has a permanent mark on the side of his face from a laceration, but was unable to recall whether he had received stitches. (Sainvilus Depo. at 115-16).  He said that the only other medical treatment that he received as a result of the incident was one hospital visit for chronic migraines, for which he received medication. (Sainvilus Depo. at 117).  At his deposition on June 6, 2014, he attested that he continued to have sporadic headaches, every week to two weeks. (Sainvilus Depo. at 120-21).  Plaintiff Sainvilus was unavailable to testify at the inquest hearing because he is currently incarcerated in New Jersey for an unrelated offense. (Inquest Hr'g Tr. at 2-3).

## II.  DISCUSSION

In their memorandum in support of their motion for a default judgment as to damages, Plaintiffs seek compensatory and punitive damages for their claims of assault, battery, and negligence, in the amounts of $3,000,000 for Plaintiff Jordonne and $300,000 for Plaintiff Sainvilus. (Docket No. 69).  At the inquest hearing, Plaintiffs confirmed that they are not seeking lost wages, and are only seeking past and future pain and suffering damages and punitive damages. (Inquest Hr'g Tr. at 48).

### A.  Legal Standards

When a party's failure to defend results in a default judgment, "the allegations in the complaint with respect to the amount of the damages are not deemed true." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *see also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  "The district court must instead conduct an inquiry in order

to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc.*, 183 F.3d at 155 (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)).  The plaintiff has the burden of proving his or her entitlement to the recovery of damages, and must rely only on admissible evidence. *Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013).  Additionally, to ensure that a defaulting party has notice of the type of relief sought, Rule 54(c) of the Federal Rules of Civil Procedure ("Rule 54") requires that the "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c); *Silge v. Merz*, 510 F.3d 157, 161 (2d Cir. 2007).  However, Rule 54 "does not require plaintiff to have demanded a sum certain in order to recover on default." *Ames v. Stat Fire Suppression, Inc.*, 227 F.R.D. 361, 362 (E.D.N.Y. 2005).

 "Calculating the appropriate amount of damages is a two-step process: (1) determining the proper rule for calculating damages on . . . a claim; and (2) assessing plaintiff's evidence supporting the damages to be determined under this rule." *Norcia*, 980 F. Supp. 2d at 500 (alteration in original) (quotation marks and citation omitted).  Where a federal court exercises diversity jurisdiction, state law provides the proper rule for calculating damages. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 437 (1996).

**B.  Rule 54(c)**

 As an initial matter, Plaintiffs have complied with Rule 54(c)'s notice requirement concerning the scope of damages, even though the Complaint does not specify the amount of damages sought. *See Glassman-Brown v. Pouring Wine, LLC*, No. 14-CV-03763(TPG)(KNF), 2015 WL 5853802, at *4 (S.D.N.Y. Aug. 5, 2015).  The Complaint alleged that Plaintiffs suffered serious and permanent physical and psychological injuries, which are continuing now

and into the future, and asserted that Defendants are jointly and severally liable to Plaintiffs for

compensatory and punitive damages. (Compl. at ¶¶ 101-02, 108-09, 115-16).  Plaintiffs demand

judgment for "compensatory and punitive damages in amount to be determined at trial." (Compl.

at 19-20).  This demand mirrors what Plaintiffs now seek in connection with Defendants' default,

and therefore Rule 54(c)'s notice requirement is satisfied. *See Braccia v. D'Blass Corp.*, No. 08

Civ. 08927(LTS)(KNF), 2011 WL 2848146, at *6 (S.D.N.Y. June 13, 2011).

## C.  Admissibility of Evidence

In support of their motion for a default judgment as to damages, Plaintiff Jordonne and

his brother Allendy appeared at the hearing and testified.  Plaintiffs also submitted five exhibits

during the hearing: Plaintiff Jordonne's medical records from Westchester Medical Center with a

certification signed by the center's Medical Records Supervisor, (Inquest Hr'g, Ex. 1 at 1), and

four color photographs of Plaintiff Jordonne following the incident, (Inquest Hr'g, Ex. 2-5).

Additionally, on September 3, 2015, in connection with Plaintiffs' counsel's declaration in

support of the motion for default judgment as to damages, Plaintiffs submitted copies of reports

from Dr. Theodore J. Batlas, who completed a neuropsychological report regarding Plaintiff

Jordonne, medical records regarding Plaintiff Sainvilus, a copy of Plaintiff Jordonne's high

school diploma, an investigative report from the New York State Division of Alcoholic Beverage

Control regarding Defendants' establishment, news reports about the venue, portions of

transcripts from the depositions of eyewitnesses, police officers, and the Plaintiffs, and a video

taken during the incident. (Inquest Decl. Ex. E-S).  I will address the admissibility of each of

these pieces of evidence.

First, as to Plaintiff Jordonne and his brother's testimony, the Court may rely on these

sworn statements in determining what damages are appropriate. *See Norcia*, 980 F. Supp. 2d at

501 (relying on plaintiff and her mother's credible testimony at an inquest hearing in reaching damages determination regarding past and future pain and suffering, medical costs, loss of earnings, punitive damages, and costs and disbursements).  The Court noted Plaintiff Jordonne's difficulty testifying at the inquest hearing, an understandable consequence of his traumatic brain injury, and found his descriptions of his symptoms entirely credible.  The Court similarly finds Allendy Jordonne's testimony to be credible.

Regarding Plaintiffs' medical records, Federal Rule of Evidence 803(6) provides an exception to the exclusion of hearsay for "records of regularly conducted activity."  Fed. R. Evid. 803(6).  Medical records fall under this exception "provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated." *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995).  The Court finds that Plaintiff Jordonne's medical records from Westchester Medical Center have been properly authenticated by virtue of the certification from Lisa Shytani, Medical Records Supervisor at Westchester Medical Center, who attested that the records are a "full and complete record to date" and to the best of her knowledge, were "made in the regular course of business of [the] institution to make such records at the time of the condition, act, occurrence or event[, or] within a reasonable time thereafter." (Inquest Hr'g, Ex. 1 at 1).  As such, the Court finds that these medical records have been properly authenticated, are admissible, and therefore can be properly considered in the damages determination.

Plaintiffs, however, have not provided a similar certification for Plaintiff Sainvilus' medical records from St. Luke's Cornwall Hospital, (Inquest Decl. at Ex. N), or for the medical records from Dr. Theodore J. Batlas, (Inquest Decl. at Ex. L).  As such, these inadmissible hearsay documents cannot be considered in the Court's damages determination. *See Norcia*, 980

F. Supp. 2d at 500 (citing *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010); *Braccia*, 2011 WL 2949146, at *3; *Cesario v. BNI Constr., Inc.*, No. 07-CV-8545, 2008 WL 5210209, at *2 (S.D.N.Y. Dec. 15, 2008), *adopted by* 2009 WL 424136 (S.D.N.Y. Feb. 19, 2009)).  Plaintiff Jordonne's high school transcript and the investigative report from the New York State Division of Alcoholic Beverage Control are similarly inadmissible for lack of testimony from a custodian of these records or other qualified witness or certification, as required by Rule 803(6)(D).  The investigative report is also not admissible as a public record in a civil action under Rule 803(8), as it has not been authenticated. *See* Fed. R. Evid. 803(8); *Braccia*, 2011 WL 2848146, at *7.  As such, the Court cannot consider these documents in its damages determination. *See Braccia*, 2011 WL 2848146, at *7.

Turning to the news reports of alleged violent activities at the venue prior to the incident in question, which Plaintiffs submitted in support of their motion for a default judgment as to damages, the Court finds that, unlike the evidence discussed above, these articles are self-authenticating under Federal Rule of Evidence 902(6), and therefore the lack of a certification does not preclude their admission. *See Nestle Co., Inc. v. Chester's Market, Inc.*, 571 F. Supp. 763,775 n.9 (D. Conn. 1983) *reversed on other grounds*, 756 F.2d 280, *on remand* 609 F. Supp. 588 (media articles were self-authenticating and therefore admissible to show public perception and usage).  Nonetheless, to the extent that Plaintiffs offer these articles for the truth of the matter asserted therein, they are inadmissible hearsay. *See McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 705 n.12 (S.D.N.Y. 1999) ("Newspaper articles are hearsay . . . and . . . are not admissible evidence."); *Holmes v. Gaynor*, 313 F. Supp. 2d 345, 358 n.1 (S.D.N.Y. 2004) (holding newspaper article inadmissible on hearsay grounds).  However, Plaintiffs also contend that Defendants knew or should have known that there was a likelihood of violence at

the venue, from which they failed to protect Plaintiffs. (Compl. at ¶ 2).  To the extent that

Plaintiffs offer these newspaper articles to demonstrate that Defendants were on notice of

allegations of violence at their venue, the fact of which is relevant to the question of punitive

damages, the Court will consider these articles as non-hearsay because they are not being offered

for the truth of the matter asserted.  *See Hous. Works, Inc. v. Turner*, No.

00CIV.1122(LAK)(JCF), 2004 WL 2101900, at *4 (S.D.N.Y. Sept. 15, 2004) *report and

recommendation adopted as modified*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005) ("These [newspaper

articles] cannot be defined as hearsay under Rule 801(c) because the plaintiff ha[s] not cited

them to prove the truth of the statements they contain; to the extent they have been cited for that

purpose, I have ignored them.")

       Finally, the Court will consider the admissibility of the deposition transcripts.  Plaintiffs

submitted a portion of the transcripts from the depositions of Plaintiff Jordonne, (Inquest Decl.

Ex. H), the entirety of Plaintiff Sainvilus' deposition transcript, (Sainvilus Depo.), and portions

of the transcripts of the depositions of non-party witnesses Bryan Faison, Police Officer Eric

Henderson, Brandon Rola, Michelle Garcia-Rybkin, Joyce Kyles, and Detective Thomas Nafey,

(Inquest Decl. Ex. E-G, J, P-Q).  Federal Rule of Evidence 804(b)(1) contains an exception to the

hearsay rule for depositions, where the witness is unavailable: "Testimony given . . . in a

deposition taken in compliance with law in the course of the same or another proceeding, if the

party against whom the testimony is now offered, or, in a civil action or proceeding, a

predecessor in interest, had an opportunity and similar motive to develop the testimony by direct,

cross, or redirect examination." Fed. R. Evid. 804(b)(1).

       As an initial matter, Plaintiff Jordonne is not unavailable, as seen by the fact that he was

present and testified at the inquest hearing.  Therefore, his deposition transcript is inadmissible

hearsay, not subject to this exception, and cannot be considered in the Court's damages
determination.  Next, Plaintiffs' counsel attested at the inquest hearing that Plaintiff Sainvilus is
currently incarcerated in New Jersey for an unrelated matter, and was, therefore, unable to attend
the inquest hearing.  This attestation is sufficient to meet the requirement that the declarant be
unavailable under the Federal Rules of Evidence. *See United States v. Sindona*, 636 F.2d 792,
804 (2d Cir. 1980) ("It is proper for the court to accept, in its discretion, the representations [of]
counsel with respect to the unavailability of a witness."); *Atkins v. City of New York*, 856 F.
Supp. 755, 757 n.3 (E.D.N.Y. 1994) (noting that the deposition testimony of a declarant who was
presently incarcerated in New Jersey "would be excepted from the hearsay rule pursuant to
Fed.R.Evid. 804(b)(1) as the former testimony of an unavailable witness").  Plaintiffs' counsel
similarly attested to the unavailability of the other deposed non-party witnesses, which the Court
finds to be sufficient evidence of their unavailability for purposes of Federal Rule of Evidence
804(b)(1).

  In addition, although Defendants were not present at the various depositions in question
and did not, therefore, question the deponents, the Court finds that they did have "an opportunity
. . . to develop the testimony by direct, cross, or redirect examination" as required by the rule,
even though they did not take advantage of that opportunity by virtue of their default.  *See
Antonucci v. Morgan Stanley Dean Witter & Co.*, No. 02CIV5246(GBD)(FM), 2005 WL
627556, at *4 (S.D.N.Y. Jan. 11, 2005) ("[Rule 804(b)(1)] does not require that the opposing
party actually cross examine the witness; it is instead enough that the opposing party be given a
meaningful opportunity to cross examine if it wishes to do so."), *report and recommendation
adopted*, No. 02 CV 5246 GBD, 2005 WL 5300159 (S.D.N.Y. May 23, 2005); *see also Pearl v.
Keystone Consol. Industries, Inc.*, 884 F.2d 1047, 1052 (7th Cir. 1989) (rejecting plaintiff's

argument that she did not have an opportunity to cross examine a witness because of the deposition's short notice, as the court determined that her lack of attendance at the deposition was voluntary and she, therefore, "had an 'opportunity' to cross-examine [the witness], and her failure to cross-examine was essentially her own decision."); *Orient Leasing (Asia) Ltd. v. Lexington Ins. Co.*, No. 84 CIV. 8234 (MJL), 1986 WL 7019, at *2 (S.D.N.Y. June 17, 1986) ("The general rule is that 'a party's decision to limit cross-examination in a discovery deposition is a strategic choice and does not preclude his adversary's use of the deposition at a subsequent proceeding.'") (citing *Hendrix v. Raybestos-Manhattan Inc.,* 776 F.2d 1492, 1506 (11th Cir. 1985)).  As such, the Court concludes that the defaulting Defendants had an opportunity to cross examine these witnesses and the deposition testimony of Plaintiff Sainvilus and the non-party witnesses[7] is admissible under Federal Rule of Evidence 804(b)(1), and may be considered as part of the Court's damages determination.

In summary, the Court will consider the sworn testimony of Plaintiff Jordonne and Allendy Jordonne, Plaintiff Jordonne's medical records from Westchester Medical Center, which have been authenticated and certified, the news reports to the extent that they are offered to show that Defendants were on notice of allegations of violence at their establishment and not for the truth of the matter asserted therein, the transcripts of Plaintiff Sainvilus' deposition, the depositions of the non-party witnesses, the video of the incident, and the photographs of Plaintiff Jordonne following the incident.  The Court will not consider the inadmissible evidence, consisting of Dr. Batlas' report, Plaintiff Sainvilus' medical records, Plaintiff Jordonne's high

---

[7] One of these non-party witnesses, Bryan Faison, testified at his deposition that he took the video of the incident, which Plaintiffs also submitted as evidence. (Inquest Decl., Ex. E at 79-80).  This testimony serves as sufficient authentication to satisfy Federal Rule of Evidence 901(b)(1), and the video is therefore admissible as well. Similarly, Allendy Jordonne provided the authentication of the photographs of Plaintiff Jordonne following the incident, and the Court will therefore consider them as well. (Inquest Hr'g Tr. at 40).

school transcript, the Alcohol Beverage Commissions' investigative report, and Plaintiff

Jordonne's deposition transcript.

## D.  Pain and Suffering Damages

Actual, or compensatory damages, are recoverable in a personal injury action under New

York law. *See Cleghorn v. New York Cent. & Hudson River R.R. Co.*, 56 N.Y. 44, 47 (N.Y.

1874).  "Generally, under New York law a plaintiff may recover his loss of earnings, medical

expenses, and mental and physical pain and suffering." *Ulrich v. Veterans Admin. Hosp.*, 853

F.2d 1078, 1082 (2d Cir. 1988).  Courts have noted that pain and suffering "does not lend itself

to neat mathematical calculation." *Caprara v. Chrystler Corp.*, 417 N.E. 2d 545, 551 (N.Y.

1981).  "New York courts have awarded past pain and suffering damages based on the medical

procedures endured and nature of the injury suffered." *House v. Kent Worldwide Mach. Works,*

*Inc.*, 359 F. App'x. at 209-10 (collecting cases).  In order to determine the appropriate damages

amount, "comparable approved awards from similar cases serve as guideposts for determining

reasonable compensation under New York law . . . ." *Norcia*, 980 F. Supp. 2d at 505 (quotation

marks and citation omitted).  In regards to future pain and suffering awards, New York courts

"take into consideration the period of time that the injuries or disabilities are expected to

continue.  If . . . the injuries or disabilities are permanent, [courts] take into consideration the

period of time that the plaintiff can be expected to live." *Braccia*, 2011 WL 2848146, at *5

(citing New York Pattern Jury Instructions Civil § 2:280 (2011)).  Actuarial tables, such as those

found in the New York Pattern Jury Instructions and the United States Department of Health and

Human Services National Vital Statistics Report, provide insight into the projected life span of

the Plaintiffs. *See Norcia*, 980 F. Supp. 2d at 505-06.

The Court will first consider the guideposts for determining Plaintiff Jordonne's reasonable compensation for past and future pain and suffering based on medical procedures endured and nature of the injury suffered.  In *Ramirez v. City of New York*, 719 N.Y.S.2d 289 (N.Y. App. Div. 2001), the Appellate Division upheld a jury verdict awarding the plaintiff $200,000 for past pain and suffering after the plaintiff sustained permanent brain damage as a result of an assault by police officers.  On the other hand, in *Regis v. City of New York*, 703 N.Y.S.2d 735 (N.Y. App. Div. 2000), the Appellate Division modified a jury verdict for a plaintiff who was repeatedly hit with nightsticks, causing various injuries, including to his brain. The Appellate Division concluded that a reasonable award for past pain and suffering for such injury was $700,000. *Id.*  These two cases provide a range of past pain and suffering awards that New York courts have found reasonable for brain injuries following an assault.

The Court has also reviewed cases in which the plaintiffs suffered similar brain injuries, although the injury was not caused by an assault.  In *Saint v. United States*, 483 F. Supp. 2d 267, 292-93 (E.D.N.Y. 2007), the court awarded a plaintiff in a motor vehicle accident $1,000,000 for five years of past pain and suffering.  The plaintiff suffered a severe closed head brain injury, including a subdural hematoma, unconsciousness for a lengthy period, seizures, brain damage sequella including vision problems and post-traumatic stress disorder, a fracture of the clavicle, psychological trauma, depression, anxiety, and feelings of hostility, and was hospitalized for six months following the accident. *Id.* at 292.  In addition, following the accident, the plaintiff had difficulty walking, and continued to fall down. *Id.* at 283.  He was not able to sleep or control his bladder at night. *Id.*  He had violent outbursts, attempting to harm his family members, and destroying property. *Id.*  At the time of trial, he was on heavy medication, twenty-one pills a day. *Id.*  The *Saint* award is in line with other New York precedent, in which the plaintiff's traumatic

brain injury resulted from a vehicular accident, and the resulting symptoms were extensive. *See Reed v. City of New York*, 757 N.Y.S.2d 244 (N.Y. App. Div. 2003) (upholding award of $2,500,000 for past pain and suffering to a pedestrian who was struck by a police motor scooter and suffered multiple skull fractures, progressive tissue loss in her occipital lobes, temporal lobes, both frontal lobes, memory loss, inability to focus, concentrate, organize, read anything complicated, cope with stress, control anger or other emotions, vertigo, complete loss of olfactory sense, post-traumatic stress, and seizures, among other symptoms); *Hernandez v. Vavra*, 880 N.Y.S.2d 50 (N.Y. App. Div. 2009) (upholding award of $1,000,000 for past pain and suffering for a pedestrian who was struck by a vehicle and suffered a subarachnoid hemorrhage, which resulted in a cerebral infarction one week following the accident, after which the plaintiff required twelve hours of home health care services a day).

Using *Saint v. United States* as a guidepost, I find that Plaintiff Jordonne's injuries and medical treatment were in line with that suffered by the plaintiff in *Saint*, but to a lesser degree, as Plaintiff Jordonne's injuries only required a one-month hospital stay, instead of six months, and his resulting symptoms are not as severe.  Accordingly, I respectfully recommend that Plaintiff Jordonne be awarded one quarter of the past pain and suffering award from *Saint*, or $250,000 in past pain and suffering damages.  This is in between the approved awards in *Ramirez* and *Regis*.

Turning to future pain and suffering award guideposts for Plaintiff Jordonne, in *Paek v. City of New York*, 812 N.Y.S.2d 83 (N.Y. App. Div. 2006), the Appellate Division reduced an award of future pain and suffering damages over forty years to $3,000,000.  In *Paek*, the plaintiff suffered a severe brain injury resulting in "permanent cognitive impairment affecting her memory, concentration, organizational ability and emotional response." *Id.*  The Plaintiff had

been a highly skilled, sought-after pattern maker at a premier fashion house, and her brain injury had made it impossible for her to work, or have a family. *Paek*, 812 N.Y.S.2d 83 (Saxe, J.P., dissenting).  The *Paek* award amounts to an annual damages award of $75,000 per year.  On the other hand, in *Henaghan v. Algie*, 981 N.Y.S.2d 635 (Suffolk Cty. Ct. 2013) (unpublished), the court awarded the plaintiff $25,000 in annual damages for future pain and suffering for a brain injury following an assault where the plaintiff had short term memory loss but was still able to babysit his granddaughter, mow the lawn, work on cars, clearly recall the incident, and there was no showing that his IQ was affected.  I conclude that Plaintiff Jordonne's brain injury has resulted in symptoms in between those suffered in *Paek* and *Henaghan*.  He is able to spend time with his son, but he cannot be alone with him.  His loss of memory affects his ability to handle money or work, but he continues to have a relationship with his family.  As such, I find that a reasonable annual damages rate for Plaintiff Jordonne's future pain and suffering is the average of the annual damages awards in *Paek* and *Henaghan*, which is $50,000 per year.

Having determined that Plaintiff Jordonne should be entitled to $50,000 per year in future pain and suffering damages, the Court now turns to the determination of his life expectancy based on actuarial tables.  Plaintiff Jordonne was born on October 22, 1990. (Inquest Hr'g Tr. at 6).  Relying on the New York Civil Pattern Jury Instructions, which last calculated life expectancy data in 1997, a male who was six to seven in 1997, as Plaintiff Jordonne was, would have been expected to live an additional 68.3 years, or until 2065. *See* N.Y. Pattern Jury Instructions—Civil div. 2, app. A (Dec. 2015).  According to this calculation, Plaintiff Jordonne

is currently expected to live an additional 49.3 years from 2016.[8]  Therefore, I respectfully

recommend that Plaintiff Jordonne be awarded $2,465,000 in future pain and suffering damages.

Next, the Court will consider the appropriate damages award for Plaintiff Sainvilus based

on the admissible evidence presented.  Beginning with past pain and suffering, *Vogt v. Paradise*

*Alley*, 816 N.Y.S.2d 644 (N.Y. App. Div. 2006), provides a useful guidepost.  In *Vogt*, the

Appellate Division upheld a $75,000 award for past pain and suffering for a plaintiff who

sustained lacerations on her face when a beer bottle thrown by defendant struck her. 816

N.Y.S.2d at 644.  Extensive stitching was required, the plaintiff had an additional surgery two

years after the incident to remove pieces of glass from the area, and her scars were still apparent

at the time of trial. *Id.*  The plaintiff also suffered from postconcussive syndrome, which resulted

in headaches and memory impairment. *Id.*  Finally, she had to undergo a root canal and crown

placement procedure as a result of the incident. *Id.*  Similarly, in *Salomon v. 1498 Third Avenue*

*Realty Corp.*, No. 91 CIV. 7592 (RWS), 1994 WL 259818 (S.D.N.Y. June 8, 1994), the court

adopted Magistrate Judge Katz's recommended damage award of $75,000 for all past and future

injuries suffered by a plaintiff who sustained a severe blow to her face and jaw, resulting in

twelve sutures, permanent scarring, intermittent numbness to the region, dizziness and

headaches.

---

[8] Calculating Plaintiff Jordonne's life expectancy based on United States Department of Health and Human Services ("USDHHS") National Vital Statistics Report data has a similar result.  Plaintiff Jordonne was seventeen to eighteen in 2008, when the last USDHHS data was available. *See* Jiaquan Xu, U.S. Dep't of Health & Human Servs., 64 Nat'l Vital Stat. Rep., no. 2, tbl.7 (February 16, 2016), *available at* *http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf.* The USDHHS data is available in five year increments, divided by racial categories. *Id.*  Plaintiffs' counsel asked the Court to apply the data for black males for both plaintiffs. (Inquest Hr'g Tr. at 4).  A black male at the age of fifteen in 2008 was expected to live 58.5 years, or 50.5 years from 2016. *Id.*  A black male at the age of twenty in 2008 was expected to live 53.7 years from 2008, or 45.7 years from 2016. *Id.*  Plaintiff Jordonne would fall in between those two figures, and therefore the Court has relied on the New York Civil Pattern Jury Instruction figure, of 49.3 years from 2016.

Although I find that Plaintiff Sainvilus' injuries and medical treatment were in line with the past pain and suffering in *Vogt* and *Salomon*, I conclude that they were not as severe. Plaintiff Sainvilus did not establish that he received any sutures for his laceration. (Sainvilus Depo. at 115-16). He required no follow-up surgeries, unlike the plaintiff in *Vogt*. Plaintiff Sainvilus attested to continued migraine symptoms as a result of the incident, but said that they were intermittent and he had only sought medical treatment for them once. (Sainvilus Depo. at 117, 120-21). As a result, I respectfully recommend that Plaintiff Sainvilus be awarded one third of the past pain and suffering award from *Vogt* and *Salomon*, or $25,000 in past pain and suffering damages. This is in line with other New York cases involving lacerations and concussions. *See Vahabe by Vahabe v. Barkus*, 541 N.Y.S.2d 549 (N.Y. App. Div. 1989) (reducing award to $50,000 in overall pain and suffering damages for plaintiff who received seven stitches on facial laceration and had a "relatively minor scar."); *Quigley v. Coco's Water Café, Inc.*, 925 N.Y.S.2d 584 (N.Y. App. Div. 2011) (affirming award of $100,000 for eleven years of past pain and suffering ($9,090 per year) to plaintiff who suffered lacerations requiring stitches and resulting in facial scarring and numbness after being struck in the face with a wine glass).

Finally, the Court finds that the admissible evidence fails to establish that Plaintiff Sainvilus' injuries can be expected to continue into the future or are permanent and, therefore, recommends no award of future pain and suffering damages. Plaintiff Sainvilus' deposition testimony indicated that he had been seeking employment, and he made no allegation that he was precluded from working as a result of his injuries. (Sainvilus Depo. at 10-16). Although he alleged that he was experiencing intermittent headaches at the time of his deposition, there is no evidence that these symptoms continue to this day in any way that impairs Plaintiff Sainvilus'

ability to engage in the primary activities of life, or that these symptoms will continue to do so into the future.  As such, the Court is unable to recommend future pain and suffering damages for this plaintiff.  Therefore, I respectfully recommend that Plaintiff Sainvilus be awarded only pain and suffering damages in the amount of $25,000 to which he is entitled.[9]

## E.  Punitive Damages

Punitive damages are recoverable in actions based on tortious conduct under New York law, where such conduct "involves malice, oppression, wanton or reckless disregard of the plaintiff's rights or other circumstances of aggravation." *O'Neill v. Yield House Inc.*, 892 F. Supp. 76, 78 (S.D.N.Y. 1995).  "Conduct that involves deceit or malice is more reprehensible than conduct involving mere negligence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014).  The Plaintiffs have provided insufficient evidence to establish that the Defendants acted with malice, oppression, wanton or reckless disregard of their rights.  They assert that a jury would likely award punitive or exemplary damages "[g]iven the Bar Owners' callous disregard for the lives and safety of their customers." (Docket No. 69).  They also submit news reports containing allegations of violence at the venue in December 2011, (Inquest Decl. Ex. O), presumably to indicate that Defendants were on notice of the violence at their venue and still failed to adequately protect Plaintiffs.  In the Complaint, Plaintiffs alleged that Defendants failed to adequately secure and supervise the premises, retain sufficient and capable security, contact police in a timely manner, monitor activity at the premises, and that they refused to allow Plaintiffs to leave the building through the front door. (Compl. at ¶ 97).  However, there is insufficient evidence that any of these actions rose to a level that would justify punitive damages.

---

[9] Neither Plaintiffs' damages should be offset by the settlement reached with Angelo Balbo Management.  While New York General Obligations Law § 15-108 allows for a reduction in damage awards based on the amount received by settling parties, such protection must be raised as an affirmative defense, or it is forfeited. *RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 447 (S.D.N.Y. 2009) (holding that § 15-108 does not apply where the non-settling defendant defaults and therefore fails to raise the affirmative defense).

Police Officer Eric Henderson attested at his deposition that he observed the security guards standing fifty to twenty feet away from the fight and "just watching it." (Inquest Decl. Ex. F at 41). However, eyewitness Bryan Faison testified that individuals were striking the security guards that were attempting to intervene in the fight. (Inquest Decl. Ex. E at 87-88). The video presents inconclusive evidence as well. The record before the Court does not contain enough evidence of whether Defendants took steps to protect the patrons of their venue. Therefore, Plaintiffs have not established that they are entitled to punitive damages.

## III. CONCLUSION

For the foregoing reasons, I respectfully recommend entry of a judgment awarding Plaintiff Jordonne $2,715,000 and Plaintiff Sainvilus $25,000 in compensatory damages. Additionally, because of the lack of evidence that Defendants' conduct met the standard for punitive damages, I respectfully recommend that no punitive damages be awarded.

Plaintiffs shall serve each defaulting Defendant with a copy of this Report and Recommendation at his last known address, and shall file appropriate proof of service with the Court by April 28, 2016.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable

Vincent L. Briccetti at the United States District Court, Southern District of New York, 300

Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at

said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Vincent

L. Briccetti and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that will be

rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga

Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   April 26, 2016
         White Plains, New York

                              **RESPECTFULLY SUBMITTED,**


                              JUDITH C. McCARTHY
                              United States Magistrate Judge